UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
NATASHA DAVIS,

                     Plaintiff,

     - against -

BOMBARDIER TRANSPORTATION
HOLDINGS (USA) INC,

                   Defendant.
-------------------------------------------------------------X
ROSLYNN R. MAUSKOPF, United States District Judge.

**MEMORANDUM AND ORDER**
11-CV-0782 (RRM) (RER)

      Plaintiff Natasha Davis brought this action against her employer, Bombardier

Transportation Holdings (USA) Inc., alleging that Bombardier discriminated against her based

on her diabetes in violation of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C.

§ 12101 *et seq.*, the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 290 *et

seq.*, and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8–101 *et

seq.*  Presently before the Court is Bombardier's motion for summary judgment pursuant to

Federal Rule of Civil Procedure 56.  For the reasons stated below, Bombardier's motion for

summary judgment is granted and Davis's claims are dismissed in their entirety.

## BACKGROUND[1]

      Bombardier, an international company based in Canada, built and operates the Air Train

shuttle transportation system for New York's John F. Kennedy International Airport ("JFK"),

which shuttles passengers between JFK's terminals and to and from major transportation hubs in

New York City.  Davis, a female diabetic on insulin, works for Bombardier as an Air Train

---

[1] The following material facts are taken from the Local Rule 56.1 statements submitted by the parties and the affidavits and exhibits submitted in connection with defendant's motion for summary judgment and the opposition thereto. Unless otherwise noted, citations to the parties' Rule 56.1 statements concern factual assertions that are admitted or are deemed admitted because they were not contradicted by citations to admissible evidence.  *See* Local R. 56.1(d); *Giannullo v. City of New York*, 322 F.3d 139, 140 (2d Cir. 2003).

Assistant ("ATA"), primarily assisting passengers on the Air Train system. She has been employed by Bombardier since April 2002.

## A. The Driver Positions

When Davis was first hired, her title was Customer Service Agent ("CSA"). As with all new CSA hires at the time, she was required to undergo a U.S. Department of Transportation ("DOT") physical exam. Davis failed the exam due to her Type I diabetes and need to take insulin. Nevertheless, based on a specific case assessment, she was determined to be able to safely perform the CSA job functions and hired as a CSA.

Davis did not begin work at that time – and in fact never worked as a CSA – because the Air Train system was not yet operational at the time that she was hired. Shortly after her hire, a fatal accident occurred during test runs of the Air Train system that prompted Bombardier to make changes to the training, testing, and certification processes of CSAs. As part of this process, Bombardier restructured the CSA position, changing the CSA title to ATA and splitting the position into two separate levels: ATA I and ATA II. Both of these positions carried substantially the same responsibilities, including providing customer service, managing emergencies, and inspecting equipment. ATA II employees, however, were also required manually to operate the Air Trains in emergency situations, while ATA I employees did not have that additional responsibility. In light of that added duty, ATA IIs received $0.75 more per hour than ATA I employees. ATA employee seniority was governed by a collective bargaining agreement, under which Bombardier could not, absent consent from the union, alter the seniority system established in the agreement.

All CSAs hired prior to this change were required to recertify in order to become ATA II employees. To become certified as an ATA II, the CSA employees had to pass an internal

Bombardier exam on manual operation of the train. According to Bombardier, the certification process also involved passing a DOT physical, a claim that Davis disputes. Initially, only fifteen CSA employees passed the ATA II certification exam. Twenty-three CSA employees, including Davis, did not pass the exam and were designated ATA Is. Davis eventually passed the exam in 2004 and became certified as an ATA II.

## B. 2005–2006 Disability Leave

In November 2005, due to a diabetes-related high-risk pregnancy, Davis requested and was granted an extended medical leave. Davis was out on medical leave for more than a year before finally returning to work on December 1, 2006, at which time she resumed working as an ATA II driver. While the record is not completely clear on this point, it does not appear that Davis was required to undergo a DOT return to work physical exam when she returned to work in December 2006; however, she was required to recertify as a driver.[2] After returning to work in December, Davis remained on the job for only a few weeks before she requested and received another medical leave of absence.

## C. 2007 Disability Leave and Subsequent Demotion

On January 25, 2007, Davis was diagnosed with proliferative diabetic retinopathy, the most common form of diabetic eye disease and a leading cause of blindness. This was the first time that Davis had suffered any vision problems. That same day, Davis requested and was granted disability leave. She remained out on disability leave from January 2007 until August of 2007, during which time she underwent at least six eye surgeries. On August 30, 2007, Davis contacted Bombardier, informing them that she was ready to return to work. On that same day, Bombardier informed Davis that she was required to undergo, and Davis submitted to, a DOT

---

[2] Although the DOT physical is relevant to the merits of plaintiff's claim of discrimination relating to her 2007 demotion, because that claim is time-barred, *see* section I.A. below, the DOT physical is ultimately not material to any final disposition.

physical exam in order to determine whether or not she was fit to continue as an ATA II driver. Davis failed the DOT physical and was found by Bombardier to be unfit to return to driving duties. (*See* Def.'s 56.1 Statement, Ex. Y.) In addition, Davis' supervisor informed her that she had failed the eye exam, although Davis asserts that she had actually passed the eye exam.[3] Although Bombardier was not required to do so by law, the parties dispute whether it was the company's unwritten policy to require employees returning from disability leave lasting longer than ninety days to undergo a DOT physical exam.

On September 1, 2007, following Bombardier's refusal to allow Davis to continue working as an ATA II driver, Davis met with her supervisor and manager to discuss her options. At the meeting, Davis and her union representative requested that Davis retain her seniority status "while taking away the manual train recover duties," (Def.'s 56.1 Statement ¶ 19; Pl.'s 56.1 Statement ¶ 19), and it was agreed that Davis would retain her ATA II seniority level while no longer having manual train-driving responsibilities. It was further agreed that Davis would be transferred to an ATA I position. Based on this meeting, Davis' hourly compensation was reduced by $0.75 per hour.

After the September 1 meeting, Davis continued on as an ATA I employee in accordance with the arrangement reached at the meeting. This arrangement did not last long, however. Shortly after the meeting, a number of Davis' co-workers – who upon losing their ATA II status and becoming ATA I employees also lost their ATA II seniority – complained that Davis had entered a new position but retained her prior seniority level. On October 22, 2007, these co-workers filed a charge with the National Labor Relations Board ("NLRB"). Shortly thereafter, the union rescinded its approval of the decision that allowed Davis to retain her grandfathered

_____

[3] Although the eye exam is relevant to the merits of plaintiff's claim of discrimination relating to her 2007 demotion, because that claim is time-barred, *see* section I.A. below, the eye exam is ultimately not material to any final disposition.

ATA II seniority and, consequently, Bombardier placed Davis at the bottom of the ATA I

seniority list.  The NLRB charge was withdrawn on November 9, 2007.

**D.  Rejected Applications for Open Job Positions**

After losing her seniority, Davis applied for two non-ATA positions within Bombardier,

but was not chosen for either position.  On April 24, 2008, Davis applied to be an Operations

Center Operator, which involved operating Air Train's automatic computer control system.  The

position required basic computer knowledge.  As part of the application process, a panel of four

supervisors interviewed all applicants, including Davis.  According to Bombardier, the panel

determined that Davis as not the most qualified for operator position, noting that "plaintiff rated

medium in four of five categories in contrast to the candidate chosen who was rated 'high' in

five of the five categories.  (Pl.'s 56.1 Statement ¶ 26.)  Davis disputes that she was not the best

qualified, noting that the applicant who did receive the operator position had arrived late to the

interview.  (*See* Pl.'s 56.1 Statement ¶ 26.)  Thereafter, in October 2008, Davis applied for a

position as a Rapid Response Operator, which involved monitoring Air Train equipment,

dispatching employees to repair equipment, and recording repairs in the system.  A total of

eleven applicants applied for five open Rapid Response Operator positions.  Davis was

interviewed for the position on October 16, 2008, by a panel of three supervisors.  Davis did not

receive the Rapid Response Operator position.

According to Bombardier, Davis was denied the positions because she was not the most

qualified.  Bombardier notes that all of the other accepted applicants rated higher than Davis,

particularly in the technical skills area.  Davis, however, claims in her deposition testimony that

she was denied these positions because of her disability and as retaliation for the long disability

leaves that she took during 2005–2006, and again in 2007.  (*See* Pl.'s 56.1 Statement (Doc. No.

31), Ex. E at 107–08.)  Davis disputes Bombardier's claim that she was not the most qualified, noting that Bombardier has not produced the interview notes for all of the eleven applicants who applied for the Rapid Response Operator position.[4]  Davis also points to comments allegedly made by co-workers and supervisors.  During the meeting on September 1, 2007, Davis claims that her former supervisor Ed Warren stated, "[Y]ou are good worker when you are here, but when you are out, you are out," and further stated that all applications for higher positions had to pass his desk.  (*See id.* at 91.)  Davis also claims that Gregg Wade, another Bombardier supervisor, informed her that she would not be promoted due to her diabetes.  (*See id.* at 108.) Davis does not deny, however, that Bombardier maintains well-established antidiscrimination policies.  (*See* Pl.'s 56.1 Statement ¶ 3.)

## E.  Shift Changes and Overtime

The ATA positions were divided into three daily shifts: morning, evening, and night. Shifts were assigned based on seniority, with only the most senior employee being guaranteed her preferred shift choice.  Davis acknowledges, however, that except for on two occasions, she always received her preferred shift.  The first exception occurred in 2008, when Davis requested the evening shift but got the morning shift.  Davis admits, however, that there was no material difference between those two shifts.  The second exception also occurred in 2008, when Davis was temporarily transferred from her regular evening shift to the night shift for a period of ninety days.  Although she was initially told to report with only four days' notice, after contacting her union, Davis was provided with two weeks' notice.  Davis received a slight pay increase during that time and, after the ninety-day period ended, she was transferred back to her regular shift.

---

[4] Bombardier has, however, produced the interview notes from all five applicants who were accepted into the Rapid Response Operator position.

During 2008 and 2009, several Bombardier employees, including Davis, were asked on a few occasions to perform mandatory overtime work due to emergency conditions. When requested to do so, Davis refused to work the overtime, but was not penalized in any manner.

## F. EEOC Charges and the Instant Suit

In November 2007, Davis submitted an EEOC questionnaire but did not file any formal charges at that time. On September 5, 2008 – after Davis was denied the Operations Center Operator position in April 2008, but prior to her being denied the Rapid Response Operator position in October 2008 – Davis filed a charge with the EEOC, alleging discrimination, failure to accommodate, and retaliation claims. On November 30, 2010, the EEOC issued a Right-to-Sue Letter. Although Davis remains employed by Bombardier, November 24, 2011, was the last occasion on which Davis was scheduled to work, as she is currently out on worker's compensation based on an unrelated injury to her arm.

Plaintiff filed the instant action on February 16, 2011. On August 16, 2011, plaintiff filed an amended complaint. At this stage of the proceedings, plaintiff is asserting the following claims: (1) discrimination pursuant to the ADA, (2) discrimination pursuant to the NYSHRL, and (3) discrimination pursuant to the NYCHRL. Bombardier has moved for summary judgment on all claims.

## STANDARD OF REVIEW

Summary judgment is appropriate when the pleadings, depositions, interrogatories, admissions, and affidavits demonstrate that there is no "genuine dispute as to any material fact" and that one party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine dispute of material fact exists "if the

evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In deciding a summary judgment motion, a district court must draw all reasonable inferences in favor of the nonmoving party. *See id.* at 249 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970)); *Castle Rock Entm't, Inc. v. Carol Publ'g Grp., Inc.*, 150 F.3d 132, 137 (2d Cir. 1998). The court must not "weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004) (quoting *Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir. 1996)). Any evidence in the record of any material fact from which an inference could be drawn in favor of the non-moving party precludes summary judgment. *See Castle Rock Entm't*, 150 F.3d at 137.

Once the movant has demonstrated that no genuine issue of material fact exists, then "the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial.*'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (emphasis in original). However, there must exist more than mere "metaphysical doubt as to the material facts" to defeat a summary judgment motion. *Id.* at 586. Instead, the non-moving party must present "concrete evidence from which a reasonable juror could return a verdict in h[er] favor." *Anderson*, 477 U.S. at 256. Only disputes over material facts "that might affect the outcome of the suit under the governing law" will properly preclude the entry of summary judgment. *Id.* at 248; *see also Matsushita*, 475 U.S. at 586.

In discrimination cases, courts are obliged to exercise particular caution in determining whether to grant summary judgment, because direct evidence of an employer's discriminatory

intent is rare and "must often be inferred from circumstantial evidence." *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 603 (2d Cir. 2006) (citation and quotations omitted); *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997). However, a plaintiff cannot defeat a summary judgment motion simply by presenting "conclusory allegations or unsubstantiated speculation." *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998).

## DISCUSSION

### I. Disability Discrimination under the ADA

#### A. Untimely claims

Plaintiff alleges violations of the ADA based on allegedly discriminatory conduct in connection with her September 2007 demotion to an ATA I position and the associated decrease in salary. Defendant argues that these claims are time-barred, having occurred prior to the relevant statutory period. As discussed below, the Court agrees.

In New York, a claimant seeking relief under the ADA is required to file a discrimination charge with the EEOC within 300 days of the alleged discriminatory or retaliatory act. *See* 42 U.S.C. § 2000e-5(e); 42 U.S.C. § 12117 (providing that Title VII procedures set forth in § 2000e-5 apply to ADA claims); *Tewksbury v. Ottaway Newspapers*, 192 F.3d 322, 327 (2d Cir. 1999); *Francis v. Blaikie Group*, 372 F. Supp. 2d 741, 746 & n.7 (S.D.N.Y. 2005), *aff'd*, 177 F. App'x 121 (2d Cir. 2006); *Sundaram v. Brookhaven Nat. Labs.*, 424 F. Supp. 2d 545, 559 (E.D.N.Y. 2006) (applying 300-day limitation period under similar procedural circumstances). When allegations of discrimination extend beyond the limitation period, "[t]he 'nature of the claim' determines whether earlier conduct will be given consideration." *Valtchev v. City of New York*, 400 F. App'x 586, 588 (2d Cir. 2010) (quoting *Petrosino v. Bell Atlantic*, 385 F.3d 210, 220 (2d Cir. 2004)). "[D]iscrete acts" of discrimination, such as "[t]ermination, [and] failure to

promote . . . are barred if not timely filed," even where other acts of discrimination allegedly

occurr within the 300-day period. *See Valtchev*, 400 F. App'x at 588. (internal quotation marks

omitted) (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114, (2002)).

Plaintiff filed a charge with the EEOC on September 5, 2008.[5] Therefore, claims of

discrimination that accrued more than 300 days before this date – that is, before November 10,

2007 – are time barred. Accordingly, plaintiff's discrimination claims relating to her September

2007 demotion to an ATA I position and the associated decrease in salary are untimely.

However, "filing a timely charge of discrimination with the EEOC is not a jurisdictional

prerequisite to suit in federal court, but a requirement that, like a statute of limitations, is subject

to waiver, estoppel, and equitable tolling." *Francis v. City of New York*, 235 F.3d 763, 767 (2d

Cir. 2000) (internal quotations omitted) (quoting *Zipes v. Trans World Airlines, Inc.*, 455 U.S.

385, 393 (1982)). Plaintiff bears the burden of demonstrating the appropriateness of equitable

tolling. *See Brown v. Research Found. of Suny Oneonta*, 381 F. App'x 119, 120 (2d Cir. 2010)

(citing *Boos v. Runyon*, 201 F.3d 178, 185 (2d Cir. 2000)). Equitable tolling is permissible for

rare and exceptional circumstances, such as when a party is prevented in some extraordinary way

from exercising his or her rights. *See Zerilli–Edelglass v. N.Y.C. Transit Auth.*, 333 F.3d 74, 80

(2d Cir. 2003) (Such circumstances include "where the plaintiff actively pursued judicial

remedies . . . was unaware of his or her cause of action due to misleading conduct of the

---

[5] Although plaintiff does not raise this issue, the Court notes that the Second Circuit has held that the filing of a questionnaire with the EEOC may be considered filing a "charge" where the writing submitted contains the factual allegations necessary to constitute a complaint and manifests an intention on the part of the filer that the EEOC investigate. *See Holowecki v. Fed. Exp. Corp.*, 440 F.3d 558, 566–67 (2d Cir. 2006), *aff'd*, 552 U.S. 389, (2008). The record does not contain a copy of plaintiff's questionnaire, filed on Novmeber 10, 2007, and there is no indication that Davis and/or the EEOC treated the questionnaire as a "charge." Plaintiff makes no claim that the questionnaire constituted a "charge" within the meaning of the ADA. Moreover, the EEOC informed Davis by letter dated December 4, 2007, that they were in receipt of her questionnaire and that, if she was "interested in filing a charge with the EEOC," she should submit the appropriate form. (Def.'s 56.1 Statement, Ex. LL.) Davis waited more than nine months from that date before submitting her charge of discrimination. Thus, plaintiff has not set forth any facts or argument to suggest in any way that that the questionnaire should be considered a "charge."

defendant . . . ." (internal quotations and citations omitted)). "[P]laintiff's failure to act diligently is not a reason to invoke equitable tolling." *South v. Saab Cars USA, Inc.*, 28 F.3d 9, 12 (2d Cir. 1994) (citing *Baldwin Cnty. Welcome Ctr. v. Brown*, 466 U.S. 147, 151 (1984)).

Similarly, the statutory period may also be tolled by proof of continuing violations. *See Schapiro v. N.Y.C. Dep't of Health*, 25 F. App'x 57, 60 (2d Cir. 2001). "[A] continuing violation may be found where there is proof of specific ongoing discriminatory policies or practices, or where specific and related instances of discrimination are permitted by the employer to continue unremedied for so long as to amount to a discriminatory policy or practice." *Id.* (quoting *Cornwell v. Robinson*, 23 F.3d 694, 704 (2d Cir. 1994)). For the doctrine of continuing violations to apply, a plaintiff must expressly allege the occurrence of a continuing violation both in the EEOC charge and in the federal lawsuit. *Schapiro*, 25 F. App'x at 60.

Plaintiff makes no attempt to demonstrate that equitable tolling or the continuing violations doctrine applies to her untimely ADA claims. Rather, plaintiff argues that her ADA claims are rendered timely under the Lilly Ledbetter Fair Pay Act of 2009 (the "Ledbetter Act"), Pub. L. No. 111–2, 123 Stat. 5 (codified as amended in scattered sections of Titles 29 and 42 U.S.C.). (Pl.'s Mem. in Opp'n at 15–16 (ECF pagination).) The Ledbetter Act provides, in relevant part:

> [A]n unlawful employment practice occurs, with respect to discrimination in compensation in violation of this subchapter, when a discriminatory compensation decision or other practice is adopted, when an individual becomes subject to a discriminatory compensation decision or other practice, or when an individual is affected by application of a discriminatory compensation decision or other practice, including each time wages, benefits, or other compensation is paid, resulting in whole or in part from such a decision or other practice.

42 U.S.C. § 2000e–5(e)(3)(A). This provision is expressly incorporated into the ADA. *See* 42 U.S.C. § 12117(a). Plaintiff argues that the Ledbetter Act applies to the present circumstances

because subsequent to "the September 2007 decision to change her job title . . . . she was paid less than her non-disabled co-workers for doing substantially the same work." (Pl.'s Mem. in Opp'n at 13.)

In support of this argument, plaintiff extracts a quote from *Zambrano-Lamhaouhi v. New York City Board of Education*, 866 F. Supp. 2d 147 (E.D.N.Y. 2011), where the court observed that the "Ledbetter Act applies where the plaintiff claims that she was paid less than other employees for similar work." (*See* Pl.'s Mem. in Opp'n at 15 (quoting *Zambrano-Lamhaouhi*, 866 F Supp. 2d at 167–68).) Plaintiff's argument, however, is plainly misplaced. The plaintiff in *Zambrano-Lamhaouhi* attempted to circumvent Title VII's time bar by arguing that the Ledbetter Act applied because "she suffered a demotion in title *and in her pay*." *Zambrano-Lamhaouhi*, 866 F. Supp. 2d at 167 (emphasis in original) (internal quotations omitted). In rejecting that argument, the court emphasized:

> Case law in the Second Circuit and elsewhere makes clear that the Ledbetter Act–under which a Title VII claim accrues with each paycheck issued pursuant to a 'discriminatory compensation decision or other practice'–applies only to discriminatory employment decisions specifically related to pay, and not to other employment decisions, *even where such decisions directly affect pay.*[6]

*Id.* at 168 (emphasis added). In other words, in order for the Ledbetter Act to apply, plaintiff must demonstrate that her wages were reduced pursuant to "a discriminatory decision to pay [her] less money" than other employees who were working in the same position, *Russell v. County of Nassau*, 696 F. Supp. 2d 213, 227 (E.D.N.Y. 2010), as opposed to being reduced because of some other employment decision. *C.f. Robinson v. Brooklyn College*, No. 09-CV-2174, 2010 WL 3924012, at *5 (E.D.N.Y. Sept. 29, 2010) (noting that Ledbetter Act does not apply to failure to promote claim); *Matthews v. Corning Inc.*, 737 F. Supp. 2d 133, 136

---

[6] Although the *Zambrano-Lamhaouhi* court applied its analysis to Title VII claims, as noted above, pursuant to 42 U.S.C. § 12117(a), the same procedures govern ADA claims.

(W.D.N.Y. 2010) (same); *Vuong v. New York Life Ins. Co.*, No. 03-CV-1075, 2009 WL 306391 (S.D.N.Y. Feb. 6, 2009) (same), *aff'd*, 360 F. App'x 218 (2d Cir. 2010).  Plaintiff fails to provide any case law to the contrary.

Here, the record makes clear that plaintiff's $0.75 pay decrease was the result of defendant's decision to transfer plaintiff into an ATA I position.  Plaintiff does not dispute that she received the same salary as all ATA I employees.  Thus, although that decision directly affected her pay, it was not – and plaintiff does not claim that it was – a decision to specifically reduce her pay.  Therefore, the Ledbetter Act does not apply.  In short, all claims under the ADA relating to conduct that occurred prior to November 10, 2007 are untimely and plaintiff has failed to demonstrate that equitable tolling, the continuing violations doctrine, or the Ledbetter Act apply to her case.  Accordingly, all ADA claims relating to conduct occurring before November 10, 2007 are dismissed.

## B.  Timely claims

Plaintiff's only timely ADA discrimination claims relate to (1) the 2008 open-position denials, and (2) the 2008–2009 shift changes and mandatory overtime.[7]  However, plaintiff's claims based on these incidents also fail.

Claims of discrimination brought pursuant to the ADA are subject to the *McDonnell Douglas* burden-shifting analysis.  *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 169 (2d Cir.

---

[7] In her opposition brief, plaintiff also argues that she was retaliated against because she filed an EEOC charge. However, because plaintiff does not assert a retaliation claim in her complaint, the Court need not address the issue of retaliation.  Moreover, even assuming *arguendo* that plaintiff had properly pleaded a retaliation claim, any such claim would fail because plaintiff has not shown that she engaged in a protected activity that can serve as a basis for a retaliation claim.  Plaintiff's EEOC charge was not filed prior to the majority of all the allegedly discriminatory acts and thus cannot serve as a basis for a relation claim.  *See, e.g., Grana v. Potter*, No. 06-CV-1173, 2009 WL 425913, a *11 (E.D.N.Y. Feb. 19, 2009) (where plaintiff filed EEOC charges *prior to majority* of alleged retaliatory acts, sufficient causal connection exists to defeat summary judgment of ADA retaliation claim).  Furthermore, even assuming that plaintiff can prove a *prima facie* case of retaliation, plaintiff's retaliation claim would fail in light of defendant's proffered legitimate, non-discriminatory explanation as discussed below.  *See Young v. Daughter of Jacob Nursing Home, (D.O.J.)*, 491 F. App'x 263, 264 (2d Cir. 2012).

2006).  To establish *prima facie* discrimination case under the ADA, plaintiff must show that (1) her employer is subject to the ADA, (2) she suffers from a disability within the meaning of the ADA, (3) she was otherwise qualified to perform job functions, and (4) she suffered an adverse employment action because of disability.  *Id.* (quoting *Giordano v. City of New York*, 274 F.3d 740, 747 (2d Cir. 2001)).  An adverse employment action is "a materially adverse change in the terms and conditions of employment [that] must be more disruptive than a mere convenience or an alteration of job responsibilities."  *Mathirampuzha v. Potter*, 548 F.3d 70, 78 (2d Cir. 2008) (quoting *Sanders v. N.Y.C Human Res. Admin.*, 361 F.3d 749, 755 (2d Cir. 2004)).  "[P]laintiff bears the initial burden" of establishing "a *prima facie* case of discrimination" under the ADA.  *Heyman v. Queens Vill. Comm. for Mental Health for Jamaica Cmty. Adolescent Program, Inc.*, 198 F.3d 68, 72 (2d Cir. 1999) (citing *Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 37 (2d Cir. 1994)).

Once plaintiff has established a *prima facie* case, the burden shifts back to defendant to demonstrate a legitimate, non-discriminatory reason for any adverse employment action.  *See Heyman*, 198 F.3d at 72. (citing *Chambers*, 43 F.3d at 38).  In order to survive summary judgment once the defendant has produced a legitimate, non-discriminatory reason, suggesting that the reasons offered are more likely than not a mere pretext designed to disguise the employer's actual discriminatory intent.  *See Heyman*, 198 F.3d at 72.  However, "plaintiff does not have to show that the employer's reasons are false or that they played no role in the decision; rather, she must show merely that the proffered reasons were not the only reasons and that discriminatory animus was at least one of the motivating factors for the adverse employment action."  *Pabon v. N.Y.C. Transit Auth.*, 703 F. Supp. 2d 188, 195 (E.D.N.Y. 2010) (quoting *Cronin v. Aetna Life Ins., Co.*, 46 F.3d 196, 203 (2d Cir. 1995)).  "Thus, the ultimate burden of

persuading the finder of fact that the employer intentionally discriminated lies with the plaintiff at all times during this burden-shifting process." *Id.* (quoting *Holt v. KMI-Cont'l, Inc.*, 95 F.3d 123, 129 (2d Cir. 1996)).

### 1. Denial of Open Job Positions in 2008

Plaintiff argues that defendant discriminated against her by denying her two job positions in April 2008 and October 2008. Assuming *arguendo* that plaintiff has established a *prima facie* case of discrimination based on these incidents, her claims fail nevertheless because plaintiff has not adduced evidence to allow a reasonable fact finder to overcome defendant's proffered legitimate, non-discriminatory explanation for these actions.

Defendant has produced uncontroverted evidence demonstrating that plaintiff was denied both positions because she was not the most qualified candidate each time. As to the April 2008 denial of the Operations Center Operator position, defendant has produced contemporaneous interview notes, taken by plaintiff's supervisor who was also one of the interviewers that evaluated plaintiff for the position. Those interview notes plainly show that plaintiff was rated lower than the applicant who ultimately secured the Operations Center Operator position. (*See* Def.'s 56.1 Statement, Exs. DD–EE.) Moreover, the accepted applicant was rated "high" in all five evaluated categories, including technical skills, while plaintiff rated only "medium" in four of them, again including technical skills. Furthermore, the Operations Center Operator position required basic computer knowledge. While plaintiff may have had the requisite basic knowledge, the uncontroverted evidence submitted by defendant indicates that the accepted applicant had greater computer skills, including programming knowledge. (*See id.*)

Similarly, as to the October 2008 Rapid Response Operator position, defendant has proffered contemporaneous notes taken during the interviews of plaintiff and the five applicants

who were ultimately given the positions. (*See* Def.'s 56.1 Statement, Exs. FF, GG.) These notes indicate that all of the applicants who were accepted into the positions were rated higher than plaintiff in each evaluated category. (*See id.*) While plaintiff was rated "high" in only one of the five categories and was also rated "low" in one of them, (*See* Def.'s 56.1 Statement, Ex. FF at 2), four of the five applicants who were accepted for the positions received "high" ratings in all categories, and the fifth received a combination of "medium" and "high" ratings (with not less than two "high" ratings from any interviewer) and did not receive any "low" ratings. (*See* Def.'s 56.1 Statement, Ex. GG at 2, 10, 18–19, 27, 35–37, 45, 47.)

These documents plainly support defendant's contention that plaintiff was denied the April 2008 Operations Center Operator and the October 2008 Rapid Response Operator positions because she was not the most qualified applicant. Thus, defendant has established a legitimate business reason for denying plaintiff the position. *See Sedelnik v. City of Bridgeport*, 837 F. Supp. 2d 12, 18–19 (D. Conn. 2011) (finding, based on observations recorded in interview panelist's notes, that defendant established legitimate business reason for not hiring plaintiff); *see also Chapman v. AI Transp.*, 229 F.3d 1012, 1033–36 (11th Cir. 2000) (en banc) (affirming district court's finding of legitimate business reason for not hiring the plaintiff based on poor interview that was memorialized in handwritten interview notes); *Kelley v. Goodyear Tire and Rubber Co.*, 220 F.3d 1174, 1176–77 (10th Cir. 2000) (affirming district court's grant of summary judgment against plaintiff on failure to hire discrimination claim where employer supported legitimate business reason with interview notes). The fact that the interview notes may reflect the subjective opinion of plaintiff's interviewers does not undermine defendant's position. *See Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 104 (2d Cir. 2001)

("[T]here is nothing unlawful about an employer's basing its hiring decision on subjective criteria, such as the impression an individual makes during an interview.").

For a variety of reasons, plaintiff claims that defendant's proffered non-discriminatory reasons are pretextual. All of these assertions fail. First, plaintiff argues that the applicant who obtained the Operations Center Operator position was late for her job interview. This fact notwithstanding, based on the interviews, the accepted applicant was clearly more qualified given that applicant's higher ratings in the relevant areas and greater technical skill. *Cf. Sedelnik*, 837 F Supp. 2d at 19 (stating that "it is not the Courts role to question the business judgment of an employer"). Importantly, plaintiff "does not present evidence to suggest that [her interviewers] did not actually hold those beliefs about [her] abilities nor does [s]he offer evidence to undermine them." *Ben-Levy v. Bloomberg, L.P.*, 518 F. App'x 17, 19 (2d Cir. 2013) (citing *Byrnie*, 243 F.3d at 105).

Next, plaintiff argues that defendant's failure to produce interview notes from *all* of the applicants interviewed for the Rapid Response Operator position suggests a pretext. (*See* Def.'s 56.1 Statement ¶ 28.) Plaintiff's position is wholly without merit. In order to satisfy its burden of demonstrating a legitimate business reason for its actions, defendant only has to show that the *accepted* applicants were more qualified than plaintiff. *See Byrnie*, 243 F.3d at 103 (stating that to overcome summary judgment "plaintiff's credentials would have to be . . . superior to the credentials of the *person selected for the job* (emphasis added)). Defendant has met that burden, as the record does contain the interview notes and evaluations of all the accepted candidates. In contrast, plaintiff does not provide any evidence that she was as qualified, let alone more qualified, than the individuals who were accepted into those positions.

Finally, plaintiff points to comments made by her supervisors and colleagues that she argues demonstrate defendant's discriminatory intent. First, plaintiff claims in her deposition testimony that during a September 2007 meeting, her former supervisor Ed Warren stated "[Y]ou are good worker when you are here, but when you are out, you are out," and further stated that all applications for higher positions had to pass his desk. (*See* Pl.'s 56.1 Statement, Ex. E at 91.) Plaintiff further asserts that Gregg Wade, another Bombardier supervisor, informed her that she would not be promoted due to her diabetes. Standing alone, however, these "stray remarks" cannot support her claim. *See Adams v. Master Carvers of Jamestown*, Ltd., 91 F. App'x 718, 722–23 (2d Cir. 2004). To determine whether allegedly discriminatory remarks are probative of actual discrimination, courts examine:

> (1) [W]ho made the remark (i.e., a decision-maker, a supervisor, or a low-level co-worker); (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark (i.e., whether a reasonable juror could view the remark as discriminatory); and (4) the context in which the remark was made (i.e., whether it was related to the decision-making process).

*Henry v. Wyeth Pharm., Inc.*, 616 F.3d 134, 149 (2d Cir. 2010).

Although he was a supervisor, Wade played no part in the 2008 job determinations. Warren was also not involved in any of the 2008 denial decisions, and in fact, and was no longer plaintiff's supervisor at the time these decisions were made. (*See* Pl.'s 56.1 Statement ¶ 26–29; Def.'s 56.1 Statement ¶¶ 26–29; *id.* Ex. D at 91–92, 108.) Nor were these comments made in relation to specific employment decisions. (*See* Def.'s 56.1 Statement, Ex. D at 91–92, 108.) Moreover, Warren's comment does not on its face evince any discriminatory animus, and was made by a supervisor whom plaintiff described as always being helpful and accommodating to her. (*See id.* at 163.) Thus, these stray comments cannot form the basis for plaintiff's discrimination claim. *See Stephan v. W. Irondequoit Cent. School Dist.*, 450 F. App'x 77, 80 (2d Cir. 2011) (discriminatory comments made by supervisor who "did not have ultimate authority

over hiring or firing decisions" insufficient to prove discrimination under ADA); *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 450–51 (2d Cir. 1999) (comments made by individual who did not play a "meaningful role" in review process not sufficient to demonstrate bias).

Plaintiff also points to statements made by co-workers, which she claims form a basis for her belief that she was denied the open job positions based on her disability.[8] In addition to the fact that none of the comments were made by supervisors – or by anyone who was involved in the job-position denial decisions (*see* Pl.'s 56.1 Statement ¶¶ 26–29; Def.'s 56.1 Statement ¶¶ 26–29) – none of these statements are properly considered here. Self-serving allegations by plaintiff about what other employees perceived as defendant's motivations are inadmissible hearsay and cannot be considered on a motion for summary judgment. *See* Fed. R. Civ. P. 56(e)(1); *see also Murphy v. Gen. Elec. Co.*, 245 F. Supp. 2d 459, 468 (N.D.N.Y. 2003) (noting that a party cannot rely on inadmissible hearsay to oppose a motion for summary judgment, absent a showing that the evidence will be available at trial) (citing *Burlington Coat Factory v. Esprit De Corp.*, 769 F.2d 919, 924 (2d Cir. 1985)); *see also Robinson v. Purcell Const. Corp.*, 859 F. Supp. 2d 245, 257 (N.D.N.Y. 2012) (finding that comments made by co-workers who "had no authority to hire or fire" could not form basis for discrimination claim).

Because plaintiff has not put forth any admissible evidence tending to refute defendants legitimate business reasons for denying plaintiff both of these positions, plaintiff's ADA discrimination claims arising from the denial of the open job positions in 2008 fail.

---

[8] Plaintiff claims that co-workers informed her that her supervisors would speak negatively about her and her disability behind closed doors. (*See* Pl.'s 56.1 Statement, Ex. E at 107; Def.'s 56.1 Statement, Ex. D at 108–09.) Specifically, Davis quotes one comment made by co-worker Dwayne Harris: "You know they trying to get back at you because you been out." (Pl.'s 56.1 Statement, Ex. E at 107.) Plaintiff admits, however, to never hearing any such comments herself. Moreover, these comments fail to point to any particular supervisor who had played a role or was otherwise involved in the job-position denial decisions.

## 2. *2008–2009 Shift Denials and Overtime*

Plaintiff also claims that defendant discriminated against her by denying her a preferred shift in 2008, by requesting that she work mandatory overtime during emergency conditions in 2008–2009, and by temporarily transferring her from her usual shift to the night shift in July 2008.  As discussed below, plaintiff fails to make out a *prima facie* case of discrimination based on these incidents.

"Employment actions that [are] deemed sufficiently disadvantageous to constitute an adverse employment action include a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation." *Russell v. Potter*, No. 10-CV-1130, 2012 WL 760562, at *3 (E.D.N.Y. Mar. 7, 2012) (quoting *Williams v. R.H. Donnelley Corp.*, 368 F.3d 123, 128 (2d Cir. 2004).

"The denial of a preferred shift (as opposed to a failure to hire or promote) is not considered an adverse employment action in the absence of objective indicia that the transfer denial created a materially significant disadvantage with respect to the conditions of employment."  *Gaidasz v. Genesee Valley. Bd. of Coop. Educ. Sys. (BOCES)*, 791 F Supp. 2d 332, 337–38 (W.D.N.Y. 2011) (quoting *Beyer v. County of Nassau*, 524 F.3d 160, 164 (2d Cir. 2008)).  In order to rise to that level, the circumstances surrounding the shift denial must "permit a reasonable factfinder to conclude that the sought for position is materially more advantageous than the employee's current position," evidenced by objective indicators such as prestige or job security.  *Id.* (quoting *Beyer*, 524 F.3d at 164–165).

Plaintiff has not adduced any evidence that the shift she requested was objectively advantageous over the shift she received.  In fact, plaintiff concedes that there was no material

difference between the two shifts.  (*See* Pl.'s 56.1 Statement ¶ 32.)  Similarly, as to the one-time

July 2008 shift change, there is no evidence that the new, temporary shift was less advantageous

than plaintiff's regular, preferred shift.  *See e.g.*, *Gaidasz*, 791 F. Supp. 2d at 339 (holding that

temporary work transfer did not rise to level of adverse employment action).  In fact, plaintiff

received a small pay increase while on that temporary shift.

Moreover, as to plaintiff's claim of discrimination based on the requested mandatory

overtime and temporary shift reassignment, the record reflects that those demands were not only

made of plaintiff, but were also required of other employees in response to emergency conditions

and to compensate for staff deficiencies.  (*See* Pl.'s 56.1 Statement ¶¶ 33, 35.)  Thus, there is no

evidence that plaintiff was treated differently than any of her co-workers.  *Cf. Schafer v.*

*Hicksville Union Free Sch. Dist.*, No. 06-CV-2531, 2011 WL 1322903, at *19 (E.D.N.Y. Mar.

31, 2011) (dismissing ADA claim where there was "no evidence that [the plaintiff] was treated

unequally because of his disability").  Moreover, as to the mandatory overtime allegation, courts

have held that "[w]here the demands of the job require working overtime *on a regular basis*, . . .

[such] overtime constitutes an essential function of the job.  *See, e.g.*, *Zaborowski v. Sealright*

*Co.*, No. 5:00-CV-77, 2002 WL 1585521, at *4 (N.D.N.Y. July 9, 2002) (citing *Davis v. Florida*

*Power & Light Co.*, 205 F.3d 1301, 1305–06 (11th Cir. 2000).  Certainly, here, where overtime

was only required during emergency conditions, such overtime must be considered an essential

job requirement.  In any event, plaintiff refused to perform the overtime work and was not

penalized for her refusal.

Therefore, the 2008 and 2009 forced shift changes and the requested mandatory overtime

do not constitute adverse employment actions.  Accordingly, plaintiff fails to make out a *prima*

*facie* disability discrimination claim based on these incidents and they must be dismissed.

## II.  State law claims

Plaintiff also brings discrimination claims under NYSHRL and NYCHRL.  A district court may decline to exercise supplemental jurisdiction over a state law claim if "the district court has dismissed all claims over which it has original jurisdiction."  28 U.S.C. § 1367(c)(3). Generally, when a court dismisses a plaintiff's federal claims, it should decline to exercise supplemental jurisdiction over the remaining state law claims as well.  *See Brzak v. United Nations*, 597 F.3d 107, 113–114 (2d Cir. 2010) ("We have said that if a plaintiff's federal claims are dismissed before trial, the state law claims should be dismissed as well." (quotations omitted)); *In re Merrill Lynch Ltd. P'ships Litig.*, 154 F.3d 56, 61 (2d Cir. 1998) ("This Court and the Supreme Court have held that when the federal claims are dismissed the state claims should be dismissed as well." (quotations and citations omitted)).  Here, having dismissed plaintiff's ADA claims, the Court declines to exercise supplemental jurisdiction in this case. Accordingly, plaintiff's NYSHRL and NYCHRL claims are dismissed.  *See Petrone v. Hampton Bays Union Free Sch. Dist.*, No. 03-CV-4359, 2013 WL 3491057, at *37 (E.D.N.Y. Jul. 10, 2013); *Myers v. New York Dept. of Motor Vehicles*, No. 06-CV-4583, 2013 WL 3990770, at *10 (E.D.N.Y. Aug. 5, 2013); *Reyes v. Krasdale Foods, Inc.*, No. 12-CV-1595, 2013 WL 2247799, at *7 (S.D.N.Y. May 22, 2013).

**CONCLUSION**

For the reasons discussed above, defendant's motion for summary judgment is granted with respect to plaintiff's ADA claims, and the Court declines to exercise supplemental jurisdiction over plaintiff's NYSHRL and NYCHRL claims. The Clerk of Court is directed to enter judgment in accordance with this order and to close this case.

SO ORDERED.

Dated: Brooklyn, New York
      December 24, 2013

*Roslynn R. Mauskopf*
_____
ROSLYNN R. MAUSKOPF
United States District Judge